Filed 10/23/23

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>LUIS ORTIZ,<br><br>    Defendant and Appellant. | H050117<br>(Santa Cruz County<br>Super. Ct. No. 19CR06616) |

In this appeal, we examine several aspects of Code of Civil Procedure section 231.7,[1] which addresses unlawful discrimination in jury selection. We analyze the limitation on appellate review, under section 231.7, subdivision (j), to the "reasons actually given" under section 231.7, subdivision (c) by the party exercising a peremptory challenge. We also consider section 231.7, subdivision (g), which sets out presumptively invalid reasons for the use of a peremptory challenge based on a prospective juror's demeanor, behavior, or manner. In so doing, we explain the statutory requirements imposed by section 231.7, subdivision (g) on the trial court and the standards for appellate review of the trial court's ruling on the section 231.7 objection.

A jury convicted defendant Luis Ortiz of 17 sex crimes against three minors. The trial court sentenced Ortiz to 225 years to life in prison. On appeal, Ortiz contends the trial court erred by overruling his section 231.7 objection to the prosecutor's use of a

---

[1] Unspecified statutory references are to the Code of Civil Procedure.

peremptory challenge against a Black prospective juror. Ortiz also challenges the admission of testimony from a defense character witness about her daughter's midtrial disclosure of molestation by Ortiz, the denial of a continuance request related to that testimony, and the CALCRIM No. 1193 jury instruction. Finally, Ortiz claims that the alleged errors were cumulatively prejudicial.

For the reasons explained below, we decide Ortiz has not shown error by the trial court in its application of section 231.7 or in the challenged evidentiary and legal rulings. We affirm the judgment.

## I. FACTS AND PROCEDURAL BACKGROUND

A. *Procedural History*

In March 2022, the Santa Cruz County District Attorney filed a second amended information (information) charging Ortiz with 18 sex crimes committed against three minors (identified as Jane Doe 1, Jane Doe 2, and Jane Doe 3) between March 15, 2004, and December 24, 2018.

More specifically, the information alleged nine counts of forcible lewd or lascivious act on a child under age 14 (Pen. Code, § 288, subd. (b)(1); count 1 [Doe 1]; counts 3, 5, 7, 10 & 12 [Doe 2]; counts 14–16 [Doe 3]), one count of lewd or lascivious act on a child under age 14 (Pen. Code, § 288, subd. (a); count 2 [Doe 2]), three counts of oral copulation or sexual penetration of a child 10 years old or younger (Pen. Code, § 288.7, subd. (b); counts 4 & 8 [Doe 2]; count 17 [Doe 3]), four counts of aggravated sexual assault on a child under age 14 by sexual penetration (Pen. Code, § 269, subd. (a)(5); counts 6, 9, 11 & 13 [Doe 2]), and one count of aggravated sexual assault on a child under age 14 by oral copulation (Pen. Code, § 269, subd. (a)(4); count 18 [Doe 3]). The information further alleged that Ortiz committed the charged offenses against more than one victim (Pen. Code, § 667.61, subd. (j)(2)) (multiple-victim enhancement).

In April 2022, the jury found Ortiz guilty of all counts except for count 8 (sexual penetration of Doe 2), on which the jury was unable to reach a verdict and the trial court

declared a mistrial. Additionally, the jury found true the multiple-victim enhancement allegation for all 10 counts that were presented for a verdict with such an allegation. The trial court dismissed count 8 on the district attorney's motion.

In June 2022, the trial court sentenced Ortiz to an aggregate prison term of 225 years to life, comprising consecutive terms of 25 years to life on nine counts (1, 2, 3, 7, 10, 12, 14, 15 & 16), a concurrent term of 25 years to life on count 5, and terms of 15 years to life on seven counts (4, 6, 9, 11, 13, 17 & 18), which were stayed pursuant to Penal Code section 654.

Ortiz timely filed a notice of appeal.

B. *Evidence Presented at Trial*

1. Prosecution Evidence

Ortiz was born in 1960 and was 62 years old at the time of trial. The prosecution presented evidence that over three decades he sexually abused four girls.

a. Evidence of Crimes Against Doe 1

Ortiz is Doe 1's great-uncle by marriage. Ortiz frequently hosted parties and family gatherings, and Doe 1's family often visited his house.

On Christmas Eve 2018, when Doe 1 was 12 years old, she went to Ortiz's home with her family. Ortiz asked Doe 1 and her younger brothers whether they wanted some potato chips. Doe 1 and one of her brothers followed Ortiz to a room used to store food items.

Ortiz and Doe 1 entered the room, and Ortiz partially closed the door. While Doe 1 was standing, Ortiz forcibly touched her breasts, buttocks, vagina, and breasts again, over her clothing from behind. When Ortiz noticed Doe 1's brother looking at them, he backed off. Doe 1 grabbed the potato chips and exited the room.

Shortly thereafter, Doe 1 tried to tell her father what happened when she saw him walking toward the bathroom. Doe 1 knocked on the bathroom door and told her father

3

to hurry up.  Ortiz grabbed Doe 1's hand and told her to give her father privacy.  Ortiz also told Doe 1 and her brother not to tell anyone.

Later, when Doe and her family went out to their car, Doe 1 told her father what had happened.  The family drove to another party, and Doe 1's parents told her to stay with them and not to tell anyone.[2]  Doe 1's father subsequently noticed changes in Doe 1's behavior.

On New Year's Eve 2018, Doe 1 told her older cousin, Doe 2, about what had happened on Christmas Eve.  Doe 2 started crying and said it had also happened to her.

In July 2019, Doe 1 told a therapist what had happened to her on Christmas Eve 2018.  The therapist called the police.

    b. Evidence of Crimes Against Doe 2

Ortiz is Doe 2's great-uncle by marriage.  Growing up, Doe 2 spent time with Ortiz's family during parties, gatherings, and trips.

Around 2005, when Doe 2 was about six years old and visiting Ortiz's home, Ortiz touched and fingered her vagina underneath her underwear as she sat on his lap.  Doe 2 felt confused by the experience and did not tell anyone because she did not know if the touching was "something normal or something out of the ordinary."

Ortiz sexually touched Doe 2 a second time when she was about nine years old. Doe 2 went to Ortiz's room to take a nap.  Ortiz was lying on the bed, so Doe 2 lay down on the edge of the bed, not wanting to get close to him.  Ortiz moved toward Doe 2 and began touching and aggressively kissing her as she tried to push him away.  Ortiz touched Doe 2's breast area and vagina on top of her clothes.  He then touched her breasts underneath her clothing and digitally penetrated her vagina.  Ortiz pulled down his pants and grabbed Doe 2's head, forcing her to orally copulate him as she tried to push him

---

[2] At some point before Christmas Eve 2018, Ortiz's wife told Doe 1's father that some very close friends from San Francisco had accused Ortiz of sexually molesting their daughter.

away.  Doe 2 felt bad for herself, betrayed, embarrassed, and lost.  She kept what had happened a secret and was afraid, disgusted, and traumatized.  Doe 2 was scared to tell anyone because of the bond between the families and because she thought her parents might not believe her.

The next sexual touching occurred when Doe 2 was about 10 years old—on the day that she was promoted from the fifth grade.  While Ortiz and his wife were driving Doe 2 home from a restaurant, and as she was sitting between them in the front seat, Ortiz put his hand inside Doe 2's underwear and digitally penetrated her vagina.  Doe 2 felt scared and stayed quiet.

On Christmas Eve, when Doe 2 was around 10 or 11 years old, Ortiz followed her into a bathroom at his home, forcibly kissed her, and digitally penetrated her vagina.  Doe 2 told him to get off her and screamed for help.

On another occasion, when Doe 2 was about 12 years old, she was at Ortiz's home with her family after school.  Doe 2 was doing homework at a desk inside the house and her family was outside in the backyard.  Ortiz brought Doe 2 some fruit, grabbed her by the hair, and forcibly kissed her.  Doe 2 told him to get off her, but he did not listen.  Ortiz squeezed her breast on top of her clothing, partially pulled down her pants "using all of his force," put his fingers inside her underwear, and digitally penetrated her.  It was painful, and Doe 2 felt traumatized but continued to keep the abuse a secret because of the family bond.

Eventually, Doe 2's father recognized that something was wrong.  Doe 2 was depressed and getting bullied.  Her father asked if there was something that she was not telling him.  After first denying it, Doe 2 started crying and told her father that Ortiz had been sexually molesting her since she was six years old.  Doe 2's father told her that they would put an end to it.[3]

---

[3] In early 2013, Doe 2's father overheard a conversation between his mother and Ortiz's wife about an allegation of molestation that had been made by the daughter of

Doe 2's father told Ortiz's wife that Ortiz had sexually touched Doe 2 several times. Ortiz's wife responded that Doe 2 was lying and begged him not to press charges. Ortiz's son accused Doe 2 of being a liar and provoking Ortiz. Doe 2 told Ortiz's wife and her two sons that Ortiz had sexually touched her for six years.

In 2013, when she was 13 to 14 years old, Doe 2 told a therapist about the abuse, and the therapist reported it to the police. Doe 2 did not disclose all the abuse during a police interview and did not know what happened with the information she gave to the police. A sheriff's lieutenant testified that the reports generated about Doe 2's allegations did not indicate that any follow-up investigation had been conducted. In the lieutenant's opinion, the lack of further investigation was "an oversight and mistake."

Doe 2 testified about Doe 1's disclosure on New Year's Eve 2018. Doe 2 saw Doe 1's suffering and felt hatred and sadness. Doe 2 told Doe 1 that Ortiz had sexually assaulted her as well. Doe 2 encouraged Doe 1 to go to therapy. Doe 2 told her parents about Doe 1's disclosure.

Later, Doe 2 learned that Ortiz's abuse of Doe 1 had been reported to the police. In 2019, when she was 20 years old, Doe 2 gave a statement to a detective about what had happened to her. Doe 2 provided more details to the police in 2019 than she had in 2013, because her therapy and healing "prepared [her] and [she] felt more confident to speak up and say more."

c. Evidence of Crimes Against Doe 3

Doe 3's family and Ortiz's family had a close relationship. Doe 3's parents were the godparents of Ortiz's son. Doe 3's family lived in South San Francisco and frequently attended gatherings and parties at Ortiz's house.

Around 2007 or 2008, when Doe 3 was about eight or nine years old, she visited Ortiz's house with her parents. Ortiz placed her on his lap, put his hand underneath her

Ortiz's close friends from San Francisco. Thereafter, Doe 2's father contacted the girl's father, who confirmed the allegation.

6

underwear, and rubbed her vagina. Doe 3 got down from his lap because she felt uncomfortable. She left the room and went to her parents. Doe 3 did not tell her parents what had happened because she was too young to understand what was going on. She tried to keep her distance from Ortiz after this incident.

Another time, Ortiz asked Doe 3 if she wanted to go to the store. While Ortiz was driving, he unzipped her pants and rubbed her vagina underneath her underwear.

A third incident occurred in a bedroom at Ortiz's house when Doe 3 was about nine years old. Doe 3 had been playing with other children when Ortiz entered. After everyone left the room except for Doe 3 and another girl, Ortiz told the other girl to exit the room and watch the door. Ortiz told Doe 3 to sit on the bed. He pulled down Doe 3's pants and underwear and orally copulated her. Doe 3 then left the room.

A few months later, when Doe 3 was 10 years old and her family was supposed to go to a party, she told her mother about the third incident. Doe 3 and her family did not contact the police but stopped going to Ortiz's house.

Doe 3's mother eventually told Ortiz's wife about the molestation. Ortiz's wife said that she did not believe it and it was a misunderstanding.

In 2019, the police contacted Doe 3's mother and wanted to talk to Doe 3. Doe 3's mother told Doe 3 that there were possibly other victims. Doe 3 disclosed all three incidents of abuse for the first time in 2019.

### d. Evidence of Uncharged Sex Offenses

V. Doe testified that she is 41 years old and has lived her entire life in Oaxaca, Mexico. Ortiz is her uncle by marriage. When V. Doe was a child, Ortiz and his wife lived near her.

Ortiz first assaulted V. Doe when she was nine years old. She was sent by her mother and aunt to Ortiz's house to retrieve something. Ortiz pulled her by the arm toward the bed on which he was lying. He hugged her, held onto her strongly, and put

7

his hand under her dress. Ortiz touched her legs, buttocks, and vagina underneath her underwear. V. Doe was scared and felt "really bad."

After this incident, Ortiz sexually touched V. Doe "multiple times." She was around Ortiz often because of their familial relationship. The abuse stopped when she was 14 years old and Ortiz and his wife moved to the United States. V. Doe never told anyone about the abuse until her niece Doe 2 came to visit her in Mexico. Doe 2 told V. Doe that Ortiz had sexually assaulted her. V. Doe said that she, too, had been abused by him.

### e. Expert Testimony on Child Sexual Abuse Accommodation Syndrome

Dr. Anthony Urquiza, a licensed psychologist, testified as an expert on child sexual abuse accommodation syndrome (CSAAS) and child sexual abuse. Dr. Urquiza described some myths and misunderstandings that CSAAS is directed at dispelling, including about disclosure and demeanor. He also explained some of the categories of CSAAS, including secrecy, helplessness, entrapment and accommodation, and delayed and unconvincing disclosure. Dr. Urquiza said CSAAS "was developed to educate people" and is not diagnostic. Dr. Urquiza did not discuss the facts of this case with the district attorney.

### 2. Defense Evidence

Ortiz called six witnesses to testify about his good character, including cousins by marriage, mothers of his godchildren, and a godchild.[4] The witnesses described Ortiz as respectful, honest, honorable, and hardworking. They did not believe that he would commit a lewd act on a child. The witnesses also did not observe any problems in Ortiz's interactions with children.

---

[4] The testimony of one character witness, L.G., is detailed *ante* (pt. II.B.1.). The prosecution recalled L.G. to testify because after she completed her defense testimony, her opinion of Ortiz changed due to her daughter's disclosure of molestation by Ortiz.

Ortiz testified in his own defense. Ortiz denied that he touched Doe 1, Doe 2, Doe 3, or V. Doe inappropriately or that he ever kissed them. Ortiz said that when he lived in Mexico, he "had seen [V. Doe]" but was never alone with her and never touched her. Ortiz denied ever touching Doe 3 or being in a room alone with her. Ortiz denied ever touching Doe 2 and denied ever driving with her in his vehicle which, at the time of her account, was a Suburban that did not have a middle front seat. He also denied following her into the bathroom and touching her there. Ortiz denied offering Doe 1 potato chips and touching her on Christmas Eve. Ortiz testified that he did not have any relationship with L.G.'s children.

## II. DISCUSSION

Ortiz raises four claims of error: (1) the trial court erred in denying his objection to the prosecutor's use of a peremptory challenge; (2) the trial court erred in admitting evidence of a midtrial disclosure of molestation made by the daughter of a defense character witness and denying a related request for a continuance; (3) the trial court erred by instructing the jury with CALCRIM No. 1193 (CALCRIM 1193); and (4) the alleged errors were cumulatively prejudicial. We address Ortiz's claims in turn.

A. *Peremptory Challenge*

Ortiz contends the trial court erred by overruling his objection under section 231.7 to the prosecutor's use of a peremptory challenge against S.H., a Black prospective juror. Ortiz further asserts that the error violated his constitutional rights to an impartial jury, a jury venire drawn from a representative cross-section of the community, and equal protection.

The Attorney General counters that the trial court did not err under section 231.7, and its factual findings are supported by substantial evidence. The Attorney General further contends that because Ortiz's section 231.7 claim fails, he necessarily has not demonstrated a violation of his constitutional rights.

9

Because Ortiz's claim under section 231.7 requires careful review of the relevant facts, we detail the written and oral questions posed to prospective jurors, and particularly to S.H.

### 1. Jury Selection

S.H. was prospective juror No. 28 in the trial jury panel. He was the sole Black juror orally questioned during voir dire. The record indicates that one other prospective juror in the trial jury panel (prospective juror No. 41) was also Black, but she apparently did not get called to the jury box and was not orally questioned during the jury selection process.

### a. Juror Questionnaire

In advance of voir dire, prospective jurors were provided a four-page questionnaire consisting of 32 questions. Most questions called for a yes-or-no answer and asked for further explanation if a certain answer were chosen. Moreover, one of the 32 questions asked for a narrative answer about the prospective juror's "attitude, in general, toward law enforcement officers," and six questions seemingly asked the prospective jurors to explain their yes-or-no answer regardless of their choice of answer.

S.H. answered all but one of the questions on the first, third, and fourth pages of the questionnaire. He included further explanation for only one of the three questions on those pages calling for elaboration of the answer. He left the second page completely blank. That page included nine questions (Nos. 13–21) that, inter alia, asked about the prospective juror's criminal history, contacts with and attitude toward law enforcement, personal beliefs about judging others, feelings about the criminal justice system, and beliefs about a child's accusations of and reactions to sexual molestation or sexual assault.

In response to question No. 28, which asked whether he would like to be a juror in this case, S.H. put an "x" next to "No." (Some capitalization omitted.) In response to the follow-up question "Why?" he wrote "TIME!"

10

When distributing questionnaires to a group of prospective jurors, the trial court emphasized that all four pages must be completed. The court remarked, "We know from jurors doing it this morning that some people missed a few pages or missed a page." The trial court's observation is corroborated by the questionnaires that are reproduced in the record on appeal. Eight of the approximately 130 questionnaires in the appellate record (including that of S.H.) contain one page left blank. Shortly before the court questioned S.H. in voir dire, a male prospective juror (S.D.) disputed the court's observation that he had failed to complete the last page of his questionnaire. The prospective juror insisted that he had filled out the entire questionnaire, saying "I filled out all four pages" and "I don't know [why that page is blank]. It was attached when I turned it in." Only three of the eight prospective jurors who had a blank page in his or her questionnaire were questioned orally during voir dire (S.H. and two others, J.C. & S.D.). Defense counsel exercised a peremptory challenge against J.C.; the court excused S.D. for cause.

b.   Voir Dire of S.H.

During the voir dire of S.H., the trial court posed the initial questions, followed by Ortiz's defense counsel and then the prosecutor.

The court began its questioning by saying: "We also missed page [two] of your form somehow. So on that page it's where we've asked a few questions. If you don't mind me asking them of you in open court. We wanted to know your general attitude towards the criminal justice system and law enforcement. Do you have anything to share regarding that?"

S.H. responded, "I don't understand the question. My attitude towards --" S.H. did not complete the sentence. The trial court replied to S.H.'s statement by explaining that one of the questions on the questionnaire is "what is your attitude in general towards law enforcement and there's also a question whether you have any close friends or family in law enforcement" (i.e., referring to the questionnaire question Nos. 15 & 16). S.H.

11

responded, "I have a friend who was a deputy. That was back in the 2000s. Other than that, no."

The trial court asked S.H. three yes-or-no questions that tracked those on the blank page of his questionnaire (i.e., question Nos. 19, 20 & 21) and then asked a question to confirm S.H.'s questionnaire answer that he had never served on a jury before. In responding to the latter question, S.H. volunteered that he "was dismissed back in '81." The court next asked S.H., "And you're a little concerned about the time of this jury, this trial?" S.H. responded "No," and the court replied, "No? Okay. All right. Anything that's come up today or yesterday that you think that the [c]ourt or counsel should know?" S.H. again said "No." The court did not ask S.H. any more questions.

In response to questions from defense counsel, S.H. said that he was in his sixties, his primary occupation when he was working was as a carpenter, and he had "worked in the restaurant business." S.H. also said he had been living in the Santa Cruz area since 1977 and had no children.

S.H. answered questions posed to him about, inter alia, children potentially making false allegations or delaying disclosure about something that had happened to them. When defense counsel asked, "What about delayed disclosure?" S.H. responded, "Delayed disclosure?" Defense counsel then clarified, "Where somebody believes something happened to them and they wait until years later to tell about it." To this clarification S.H. responded, "That happens all of the time."

Next, defense counsel asked, "Is there anything that you'd like to share with us today?" S.H. responded, "Um --" but did not complete the sentence. Defense counsel replied, "Okay. No problem." Thereafter, S.H. answered a series of yes-or-no questions reaffirming that he could be fair to both sides.

The prosecutor began her questioning of S.H. by asking, "Was there any reason why you didn't answer the entire page two of your form?" S.H. responded, "What was it?" The prosecutor replied, "They are questions 13 through 21. They involve feelings

12

towards law enforcement [].  Have you ever been charged or convicted of a crime.  General attitude towards law enforcement.  Anything there that -- no?[5]  Okay.  Well, do you have any experience with our office, anything about the DA's office here in Santa Cruz any favorable or unfavorable experiences?"  S.H. answered, "No."

The prosecutor questioned S.H. about his employment history, noting S.H.'s statement that he had worked as a carpenter.  The prosecutor asked, "And how long ago did you retire -- did you work full time with that or what kind of work was that?"  S.H. responded, "Full time.  I was a local 829 and went through '92."  In response to the prosecutor's seeming incomprehension of S.H.'s answer, S.H. explained that "829 was the local" of the carpenters union and, upon further questioning, confirmed that he had worked as a carpenter until 1992, including "on projects together with people."

The prosecutor then asked, "And after '92 -- what do you normally do now that you're retired?"  S.H. responded that he "buy[s] security lockers."  When the prosecutor stated that she did not understand S.H.'s answer, he explained that he "buy[s] storage lockers" at auction and then keeps or sells their contents.  The prosecutor next asked, "Anything else that you've done with your time since you've retired from carpentry?"  That question resulted in the following exchange:  "[S.H.]:  Just try to live.  [¶] [Prosecutor]:  Since you lived?  [¶]  [S.H.]:  Just trying to live.  [¶]  [Prosecutor]:  Just trying to live.  I apologize.  Okay."

After S.H. reiterated that he had never served on a jury before because he "didn't make it through," the prosecutor asked him how he felt about the criminal justice system.  That question prompted the following exchange:  "[S.H.]:  How do I feel about the criminal justice system?  They're there to do a job.  I don't have any quarrels.  [¶] [Prosecutor]:  What was that?  [¶]  [S.H.]:  I don't have any bad feelings or quarrels about

---

**5** The reporter's transcript does not reflect that S.H. verbally answered the prosecutor's question in the negative.  Likewise, the transcript does not describe any nonverbal response by S.H.

it. [¶] [Prosecutor]: Okay. Okay. So no opinions either way? [¶] [S.H.]: Not really. [¶] [Prosecutor]: Okay."

When asked if he thought child molestation and sexual assault were crimes that "occur in front of a lot of people," S.H. responded "Yes and no. They occur everywhere at any time. There could be a lot of people. There could be no one there." In response to a follow up question by the prosecutor about whether people are "usually present when sexual assault occurs," S.H. responded, "Not normally." Continuing in the same vein, the prosecutor asked if S.H. was "comfortable" with the premise that a "single witness can prove any fact if you find that witness credible and in a sexual assault if you find the victim credible." S.H. responded, "Until all of the evidence is clearly stated, no." The prosecutor next asked S.H. what he meant by his answer and the following exchange occurred: "[S.H.]: I mean it could go either way. [¶] [Prosecutor]: You'd have to listen to everything? [¶] [S.H.]: Yes. [¶] [Prosecutor]: But are you comfortable -- sorry. To clarify. Are you comfortable with the direction that if you find a witness credible you don't need more evidence, it's up to you? [¶] [S.H.]: Well, I would take that as a yes. [¶] [Prosecutor]: Okay."

Regarding delayed reporting of sexual assault or molestation, S.H. said that "[f]ear" could be a reason for the delay and he would not automatically disregard testimony because of a delay in reporting. Regarding criminal intent, when the prosecutor asked, "Do you feel comfortable trying to determine sexual intent in this case in the actions and that kind of thing being able to determine sexual intent?" S.H. responded, "No." The exchange continued: "[Prosecutor]: No, you don't feel comfortable? [¶] [S.H.]: No. I wouldn't have any problem with that. [¶] [Prosecutor]: I see. You don't have any problem."

The final topic covered by the prosecutor in her questioning of S.H. concerned "conflict in testimony." The questioning proceeded as follows:

14

"[Prosecutor]: . . . And regarding conflict in testimony, so an adult says something happened and a child says it didn't. Do you feel comfortable resolving that conflict?

"[S.H.]: Resolving?

"[Prosecutor]: Yeah.

"[S.H.]: Meaning would I go either way?

"[Prosecutor]: No. You would have to --

"[S.H.]: Resolving.

"[Prosecutor]: Yes. So making a decision about the conflict in testimony.

"[S.H.]: I wouldn't have any problem.

"[Prosecutor]: Okay. Do you know what I'm saying by that?

"[S.H.]: I'm not following, no.

"[Prosecutor]: Sure. So my question is about resolving different testimony. So one person comes in and says -- we'll take it out of sexual assault. One person comes in and says the light was yellow and the next witness comes in and says, no, the light was red, okay. So you've got two different types of testimony. Your job is going to be to resolve that testimony, to find the facts. Do you feel comfortable being able to do that?

"[S.H.]: To be truthful no.

"[Prosecutor]: Okay. And that's what we want to hear. I want to hear -- there's no bad answers here. Sometimes people feel like there's a good or versus bad answers, but, you know, some people just really don't feel comfortable resolving that and I appreciate your answer and your response. Is there a reason why you really just don't feel comfortable doing that?

"[S.H.]: Well, if I'm wrong it could be serious.

"[Prosecutor]: Yeah. And there could be serious consequences, yeah. Okay. Thank you very much for your time.

"[S.H.]: You're welcome."

c. Prosecutor's Peremptory Challenge of S.H.

Outside the presence of the prospective jurors and immediately after S.H. moved from seat No. 18 into one of the 12 seats in the jury box, the prosecutor indicated her intent to exercise her sixth peremptory challenge against him.[6] Ortiz's defense counsel objected under section 231.7. Defense counsel noted that "the entire jury [pool]" had been "overwhelmingly white so far." The trial court interjected to note that the pool included "quite [a] lot of Latin potential jurors before hardships." Counsel acknowledged the court's point and remarked further that S.H. was "the one person of color that's made it into the box so far" and "I can't say that we've even had somebody that was Latina or Latino in the box. Maybe one or two."

In response to defense counsel's objection, the prosecutor requested that the trial court "make observations on the record about [S.H.]'s demeanor."

Before the trial court made any findings, the prosecutor offered her reasons for challenging S.H. (hereafter initial statement of reasons): "[S.H.] was not able to answer or understand some very basic questions. He seemed easily confused or unable to answer questions. There [were] a couple of times that he did not answer questions. He left the entire page, page [two], blank on his questionnaire form which, again, I think shows his confusion in terms of a race [neutral] justification, for example, answering only two out of ten questions with -- [sic] [that S.H.] actually omitted more than two out of ten questions is a valid race neutral reason to use a peremptory challenge . . . . [¶] He was often -- in terms of demeanor I'll ask the [c]ourt to make a finding soft spoken, reluctant and timid [] demeanor is a valid reason -- not race neutral reason to kick a juror [sic]."[7]

_____

[6] By this point in the jury selection process, the prosecutor had exercised five successive peremptory challenges and subsequently declined to exercise a challenge following three peremptory challenges by defense counsel.

[7] The prosecutor cited *People v. Perez* (1994) 29 Cal.App.4th 1313 and *People v. Duff* (2014) 58 Cal.4th 527 as supporting the race neutrality of her stated reasons. In *Perez*, the Court of Appeal concluded that, among other things, a prospective juror's "reluctance to answer various questions on the questionnaire" and the need "to prod her

16

The prosecutor did not cite any other reasons for challenging S.H. in her initial statement of reasons.

In response to the prosecutor's initial statement of reasons, the trial court made a number of observations. The court noted that S.H. "is not of the same cognizable group as any witness, as the defendant, [or] as any party." The court continued: "There were plenty of voir dire questions asked of [S.H.] His lack of responsiveness on this extensive form to which most jurors gave lots and lots of answers -- a few gave, you know, more sparse answers, but his was by far the most sparse. I mean just the fact that even on the third question if retired or unemployed past employment, he left it blank[8] and we had to push him to start talking about what he did in the past. He left that whole second page blank. He was very confused when I asked about it. When I followed up on his response about do you want to be a juror in this case he wrote no and time. When I asked him about that he was absolutely confused, kind of denied even writing it, almost -- I would say about half of the questions that the [c]ourt and counsel asked him he did not seem to understand. He gave answers that were confused, very difficult to hear. Part of that was he did have a double mask on. I'll acknowledge that, but even when I asked for clarification his answers were not very straightforward and on top of that it was almost a cause challenge when he said he was not very comfortable resolving conflicts in the evidence because he would be thinking about the consequences. [¶] I still am unclear on what he said he did for a living, but, anyway, I just think that it's really sad. I wish we could have a diverse jury. I wish that we didn't have to use this person, but I absolutely think that there's justification for a peremptory to be used for this person. If this was a

---

to get answers to a number of questions" "are race-neutral explanations." (*Perez*, at p. 1329.) In *Duff*, our Supreme Court stated "that prosecutors may legitimately choose to shy away from followers or unduly timid jurors." (*Duff*, at p. 546.)

[8] The trial court was referring to the following information on S.H.'s questionnaire: "2. Current occupation and employer: *None*. [¶] 3. If retired or unemployed, past employment: [blank/no answer provided]." (Italics indicate S.H.'s handwritten answer.)

person of white skin or any other background it would clearly be a justified excuse. So given that does anybody else have any comments?"

Defense counsel noted that, under section 231.7, subdivision (g)(1), certain reasons—including inattentiveness, lack of rapport, problematic attitude, and unintelligent or confused answers—"have historically been associated with improper discrimination in jury selection" and are presumptively invalid unless the trial court confirms that the behavior occurred and, regardless of any confirmation, the prosecutor had to "explain why that demeanor matters."

The trial court responded that it believed it had confirmed "those observations." The court asked the prosecutor to "explain why the evasiveness matters."

The prosecutor provided the following explanation in response to the trial court: "Your Honor, we are in a search to understand the potential jurors' perspectives on various areas of criminal law and feelings. The entire page [two] of his questionnaire was blank. Those were well over failing to adequately fill out the responsive forms is a -- still a very valid neutral reason to kick somebody [*sic*]. *Duff* and *Perez* are still very valid case law. The [c]ourt can make --"

The trial court interrupted the prosecutor by saying, "I'm sorry if you didn't understand what I was trying to ask. [Defense counsel] represented that the statute requires you to explain not just the reasons but why they're relevant to your excusing him. Like he is evasive and so we don't know if he's being truthful and he might be hiding some kind of bias. Is that what you mean?"

The prosecutor echoed the trial court's observations in continuing her explanation for the asserted behavior-based reasons. She said, "Yes, and the -- his -- inability to answer the questions in a way that could be understood. I was unable to determine if there were potential answers to many questions that could be a reason. And additionally the People think that we've met our for cause burden. The . . . juror specifically said that he would be considering punishment and would be considering that in his deliberation.

18

So that would be another reason why the People would not want [S.H.] on the jury.  [¶] So he's unable to answer the basic questions.  He was unable to answer the form.  He had evasive questioning.  The People were not able to ascertain several answers that were resubmitted [*sic*].  Sometimes I asked it in different ways and he still was unable to give a clear response and he clearly stated that he would be considering punishment when resolving conflicts in testimony.  For all of those reasons I am exercising my peremptory challenge."

The trial court concluded the discussion by ruling as follows:  "As stated -- I mean this was a juror whose responses were so very different than any other juror who's been responding in terms of his -- like, again, his confusion, his evasiveness and I just also want to just kind of go through some of these other checklists issues.  [¶]  You know, I don't believe that [the prosecutor] or her office have used preemptory challenges disproportionately in the past or in this case towards African-Americans.  Anyway, I think that there's none of the presumptively invalid reasons other than the ones that can be confirmed by the Judge and I'm confirming those at this time.  So I'm going to grant that challenge.  I'm just going to let [S.H.] know that he's been excused and we'll proceed from there."

When the prospective jurors returned to the courtroom, the prosecutor exercised her sixth peremptory challenge to excuse S.H.

2.  <u>Law on Unlawful Discrimination in the Use of Peremptory Challenges</u>

a.  Peremptory Challenges Prior to 2022

" ' "Both the federal and state Constitutions prohibit any advocate's use of peremptory challenges to exclude prospective jurors based on race." '  [Citation.] ' "Doing so violates both the equal protection clause of the United States Constitution and the right to trial by a jury drawn from a representative cross-section of the community under article I, section 16 of the California Constitution." ' " (*People v. Holmes, McClain and Newborn* (2022) 12 Cal.5th 719, 759–760.)

19

"Before January 1, 2022, trial courts examined peremptory challenges under the three-step inquiry established by *Batson v. Kentucky* (1986) 476 U.S. 79 and *People v. Wheeler* (1978) 22 Cal.3d 258.  Recognizing the limitations of the *Batson/Wheeler* inquiry, the Legislature enacted Assembly Bill No. 3070 (2019-2020 Reg. Sess.) to add Code of Civil Procedure section 231.7, which creates new procedures for identifying unlawful discrimination in the use of peremptory challenges."  (*People v. Jaime* (2023) 91 Cal.App.5th 941, 943, fn. omitted (*Jaime*).)  The Legislature intended that the new law "be broadly construed to further the purpose of eliminating the use of group stereotypes and discrimination, whether based on conscious or unconscious bias, in the exercise of peremptory challenges."  (Stats. 2020, Ch. 318, § 1, subd. (c).)

b.   Peremptory Challenges under Section 231.7

Section 231.7 applies to all criminal jury trials in which jury selection began on or after January 1, 2022.  (§ 231.7, subd. (i).)  It does not apply to civil cases until January 1, 2026.  (§ 231.7, subds. (k), (n); Stats. 2020, ch. 318, § 3.)

Section 231.7, subdivision (a) prohibits the use of "a peremptory challenge to remove a prospective juror on the basis of the prospective juror's race, ethnicity, gender, gender identity, sexual orientation, national origin, or religious affiliation, or the perceived membership of the prospective juror in any of those groups."

A party or the trial court on its own motion may object that a party's use of a peremptory challenge violates section 231.7, subdivision (a).  (§ 231.7, subd. (b).)  A motion made under section 231.7 "shall also be deemed a sufficient presentation of claims asserting the discriminatory exclusion of jurors in violation of the United States and California Constitutions."  (*Id*., subd. (d)(1).)  The statue does not require any threshold showing by the objecting party.

If a party or the trial court objects to the use of a peremptory challenge, "the party exercising the peremptory challenge shall state the reasons the peremptory challenge has been exercised."  (§ 231.7, subd. (c).)

20

After the party exercising the challenge states the reasons for it, the trial court must decide whether to sustain the objection. In so doing, the court "shall evaluate the reasons given to justify the peremptory challenge in light of the totality of the circumstances." (§ 231.7, subd. (d)(1).) The court may only consider the reasons stated by the party using the peremptory challenge: "The court shall consider only the reasons actually given and shall not speculate on, or assume the existence of, other possible justifications for the use of the peremptory challenge." (*Ibid*.)

The trial court shall sustain the objection "[i]f the court determines there is a substantial likelihood that an objectively reasonable person would view race, ethnicity, gender, gender identity, sexual orientation, national origin, or religious affiliation, or perceived membership in any of those groups, as a factor in the use of the peremptory challenge." (§ 231.7, subd. (d)(1).) "[A] 'substantial likelihood' means more than a mere possibility but less than a standard of more likely than not." (*Id*., subd. (d)(2)(B).) The court "need not find purposeful discrimination" to sustain an objection to a peremptory challenge. (*Ibid*.)

With respect to the section 231.7, subdivision (d)(1) determination, the statue provides that "an objectively reasonable person is aware that unconscious bias, in addition to purposeful discrimination, have resulted in the unfair exclusion of potential jurors in the State of California." (*Id*., subd. (d)(2)(A).) In addition, an " 'unconscious bias' includes implicit and institutional biases." (*Id*., subd. (d)(2)(C).)

Subdivision (d)(3) of section 231.7 provides a nonexhaustive list of circumstances the trial court may consider in making its determination (§ 231.7, subd. (d)(3)(A)–(G)), including "[w]hether the reason given by the party exercising the peremptory challenge was contrary to or unsupported by the record" (*id*., subd. (d)(3)(F).)

Once the trial court has made a determination under subdivision (d)(1), it "shall explain the reasons for its ruling on the record." (§ 231.7, subd. (d)(1).)

21

In addition to the standard for the court's determination provided by section 231.7 subdivision (d)(1), and the evaluative criteria set out in subdivision (d)(3), the statute contains two separate provisions (subdivisions (e) and (g)) describing presumptively invalid reasons for the exercise of a peremptory challenge. Each subdivision sets out a distinct process by which a court determines whether a presumptively invalid reason can be absolved of that presumption. (*Id*., subds. (e), (f), (g)(2).)

Section 231.7, subdivision (e) provides a wide-ranging list of reasons that are "presumed to be invalid." (*Id*., subd. (e)(1)–(13).) The presumptively invalid reasons listed under subdivision (e) include "[e]xpressing a distrust of or having a negative experience with law enforcement or the criminal legal system" (*id*., subd. (e)(1)), "[h]aving a close relationship with people who have been stopped, arrested, or convicted of a crime" (*id*., subd. (e)(3)), "[l]ack of employment or underemployment of the prospective juror or prospective juror's family member" (*id*., subd. (e)(11)) and "[a]ny justification that is similarly applicable to a questioned prospective juror or jurors, who are not members of the same cognizable group as the challenged prospective juror, but were not the subject of a peremptory challenge by that party" (*id*., subd. (e)(13)).

If the party using the peremptory challenge states as a reason one of those listed in section 231.7, subdivision (e), the "reason[] is presumed to be invalid unless the party exercising the peremptory challenge can show by clear and convincing evidence that an objectively reasonable person would view the rationale as unrelated to a prospective juror's race, ethnicity, gender, gender identity, sexual orientation, national origin, or religious affiliation, or perceived membership in any of those groups, and that the reasons articulated bear on the prospective juror's ability to be fair and impartial in the case." (*Ibid*.) Subdivision (f) of section 231.7 defines the term " 'clear and convincing' " and explains how a court determines whether "a presumption of invalidity has been overcome."

22

Section 231.7, subdivision (g) contains a different list of presumptively invalid reasons.[9] The reasons under subdivision (g) involve a prospective juror's demeanor, behavior, or manner: "The prospective juror was inattentive, or staring or failing to make eye contact" (*id*., subd. (g)(1)(A)), "[t]he prospective juror exhibited either a lack of rapport or problematic attitude, body language, or demeanor" (*id*., subd. (g)(1)(B)), and "[t]he prospective juror provided unintelligent or confused answers" (*id*., subd. (g)(1)(C)).

The three demeanor-, behavior-, or manner-based reasons listed in section 231.7, subdivision (g)(1)(A)–(C) "are presumptively invalid unless the trial court is able to confirm that the asserted behavior occurred, based on the court's own observations or the observations of counsel for the objecting party. Even with that confirmation, the counsel offering the reason shall explain why the asserted demeanor, behavior, or manner in which the prospective juror answered questions matters to the case to be tried." (*Id*., subd. (g)(2).)

Section 231.7, subdivision (g)(2) therefore provides for a two-step process. We will call the first step the "confirmation requirement." If a reason given by the party exercising the challenge falls within the presumptively invalid reasons listed in subdivision (g)(1)(A)–(C), the trial court must make a finding on whether the asserted behavior occurred. If the court confirms that the asserted behavior occurred, then the party exercising the peremptory challenge must satisfy what we will call the "explanation requirement." In this step, the party must explain why that behavior "matters to the case to be tried." (*Id*., subd. (g)(2).)

The statute does not spell out what must occur if the trial court fulfills the confirmation requirement and the counsel fulfills the explanation requirement—a question we examine further below.

_____

[9] The subdivision states that the three listed reasons "have historically been associated with improper discrimination in jury selection." (§ 231.7, subd. (g)(1).)

23

For purpose of appellate review of the trial court's general conclusions under section 231.7, the statute sets out different standards of review. It calls for de novo review of a trial court's decision to overrule an objection to a peremptory challenge, "with the trial court's express factual findings reviewed for substantial evidence."[10] (*Id.*, subd. (j).)

The statute also limits the bases upon which an appellate court may affirm the trial court's ruling. The appellate court "shall not impute to the trial court any findings, including findings of a prospective juror's demeanor, that the trial court did not expressly state on the record." (§ 231.7, subd. (j).) In addition, just as the trial court may only consider "the reasons actually given" by the party exercising the peremptory challenge (*id.*, subd. (d)(1)), so, too, "[t]he reviewing court shall consider only reasons actually given under subdivision (c) and shall not speculate as to or consider reasons that were not given to explain either the party's use of the peremptory challenge or the party's failure to challenge similarly situated jurors who are not members of the same cognizable group as the challenged juror, regardless of whether the moving party made a comparative analysis argument in the trial court." (*Id.*, subd. (j).)

Finally, the statute precludes a finding of harmless error. If the appellate court concludes that the trial court erred by overruling an objection under section 231.7, "that error shall be deemed prejudicial, the judgment shall be reversed, and the case remanded for a new trial." (§ 231.7, subd. (j).)

### 3. Application of Section 231.7

Ortiz contends "[t]he prosecutor's stated reasons for excusing [S.H.] were the exact types of reasons that Code of Civil Procedure section 231.7 expressly provides as

---

[10] "Evidence is substantial if it is reasonable, credible and of solid value." (*People v. Lenix* (2008) 44 Cal.4th 602, 627 (*Lenix*); see also *Orange County Water Dist. v. The Arnold Engineering Co.* (2018) 31 Cal.App.5th 96, 129, fn. 12 [" '[s]ubstantial evidence' " is a "legal term of art"]; *People v. Gonzales* (2017) 2 Cal.5th 858, 871 [presuming the Legislature is aware of the ramifications of using a legal term of art].)

24

having 'historically been associated with improper discrimination in jury selection.' " He further asserts that the prosecutor's characterizations of S.H.'s answers are not supported by substantial evidence and the prosecutor "failed to provide an adequate explanation" under section 231.7, subdivision (g)(2).

In interpreting a statute, " ' " ' "our fundamental task [] is to determine the Legislature's intent so as to effectuate the law's purpose. [Citation.] We begin by examining the statute's words, giving them a plain and commonsense meaning." ' " ' [Citation.] ' "[W]e look to 'the entire substance of the statute . . . in order to determine the scope and purpose of the provision . . . . [Citation.]' [Citation.] That is, we construe the words in question ' "in context, keeping in mind the nature and obvious purpose of the statute . . . ." [Citation.]' [Citation.] We must harmonize 'the various parts of a statutory enactment . . . by considering the particular clause or section in the context of the statutory framework as a whole.' " ' " (*People v. Lewis* (2021) 11 Cal.5th 952, 961.)

" ' " ' "If the language is clear, courts must generally follow its plain meaning unless a literal interpretation would result in absurd consequences the Legislature did not intend. If the statutory language permits more than one reasonable interpretation, courts may consider other aids, such as the statute's purpose, legislative history, and public policy." ' " ' " (*Smith v. LoanMe, Inc.* (2021) 11 Cal.5th 183, 190.)

"The proper interpretation of a statute is a question of law subject to de novo review." (*People v. Harring* (2021) 69 Cal.App.5th 483, 495 (*Harring*).)

   a. Section 231.7, Subdivisions (c) and (j): Reasons Actually Given

As an initial matter, we must determine which of the prosecutor's reasons are proper for us to consider under section 231.7, subdivision (j). That subdivision specifically directs that "[t]he reviewing court *shall consider only reasons actually given under subdivision (c)* and shall not speculate as to or consider reasons that were not given to explain either the party's use of the peremptory challenge or the party's failure to

25

challenge similarly situated jurors who are not members of the same cognizable group as the challenged juror." (*Ibid.*, italics added.)

Because neither party in his initial briefing addressed the potential effect of that limitation on our review of the present record, we requested supplemental briefing on whether we should consider two reasons that the prosecutor gave to support the peremptory challenge of S.H. after the trial court suggested them following the prosecutor's proffer of her initial statement of reasons. The two reasons we identified as falling within that category are (as articulated by the prosecutor): (1) S.H. " 'said that he would be considering punishment and would be considering that in his deliberation' " and " 'clearly stated that he would be considering punishment when resolving conflicts in testimony;' " and (2) S.H. " 'had evasive questioning.' " We also asked the parties to address the implication of a determination that either reason or both could not be considered in our review of the trial court's denial of Ortiz's objection to the peremptory challenge.

To provide context, we summarize the colloquy between the prosecutor and the trial court about the prosecutor's reasons for her use of a peremptory challenge against S.H.

In her initial statement of reasons, the prosecutor said that S.H. "was not able to answer or understand some very basic questions," "seemed easily confused or unable to answer questions," "did not answer questions" "a couple of times," and "left the entire page, page [two], blank on his questionnaire," which further demonstrated his confusion. In addition to providing these reasons, the prosecutor asked the trial court to find, "in terms of demeanor," that S.H. was "soft spoken, reluctant and timid."

After the trial court stated its own observations about S.H. and defense counsel pointed out that the prosecutor's reasons were presumptively invalid under section 231.7, subdivision (g)(1), the court stated its belief that it had confirmed the demeanor and

26

behaviors that the prosecutor asserted. The court then asked the prosecutor to explain, under section 231.7, subdivision (g)(2), why "the evasiveness matters."[11]

In response to the trial court's request, the prosecutor mentioned the "search to understand the potential jurors' perspectives on various areas of criminal law and feelings" and then reiterated that a page of S.H.'s questionnaire was blank and failure to adequately fill out a questionnaire is "still a very valid neutral reason to kick somebody." The court interrupted the prosecutor's effort to explain why her stated reasons mattered.

The trial court asked if the prosecutor meant that evasiveness renders her unable to "know if [S.H.] is being truthful and he might be hiding some kind of bias." The prosecutor responded "Yes" and explained further that S.H. has an "inability to answer the questions in a way that could be understood," such that she was "unable to determine if there were potential answers to many questions that could be a reason." The prosecutor also reiterated that S.H. was "unable to answer the basic questions" and "unable to answer the form," and added (for the first time) that S.H. "had *evasive* questioning" (italics added) which left the prosecutor unable "to ascertain several answers [to questions] that were resubmitted" or "asked [] in different ways."

In addition to providing these explanations and reasons, the prosecutor added a new reason for her peremptory challenge. The prosecutor asserted her belief the prosecution had "met [its] for cause burden" because S.H. "specifically said that he would be considering punishment and would be considering that in his deliberation." The prosecutor also said that S.H. "clearly stated that he would be considering punishment when resolving conflicts in testimony." This reason largely paralleled an earlier comment made by the trial court after the prosecutor had provided her initial statement of reasons: "[O]n top of that it was almost a cause challenge when [S.H.] said he was not very comfortable resolving conflicts in the evidence because he would be

---

[11] Up to this point in the discussion of the peremptory challenge, the prosecutor had not used the word "evasiveness" or "evasive" in stating her reasons for striking S.H.

thinking about the consequences." There is no indication in the record that the prosecutor ever moved the trial court to excuse S.H. for cause.

In other words, after the prosecutor had provided her initial statement of reasons upon Ortiz's objection, she offered two additional reasons when the trial court asked her, during the two-step confirmation and explanation process under section 231.7, subdivision (g)(2), to explain why her initial demeanor-, behavior-, or manner-based reasons mattered to the case. More specifically, the prosecutor added that S.H. "had evasive questioning" and had said that he "would be considering punishment and would be considering that in his deliberation" or "when resolving conflicts in testimony." The prosecutor's additional reasons substantially resembled statements made by the trial court after the prosecutor offered her initial statement of reasons.

In his supplemental letter brief, Ortiz argues the trial court erred under section 231.7, subdivision (d)(1) by offering additional reasons to justify the prosecutor's peremptory challenge and those reasons that were adopted by the prosecution "do not qualify as 'reasons actually given' for purposes of a section 231.7 analysis."[12] Ortiz further asserts that "[u]pon a determination that these additional reasons cannot be considered, this [c]ourt must find that the trial court therefore erred in relying on those reasons to deny the defense objection to the peremptory challenge."

The Attorney General suggests a different approach to our consideration of the present circumstances. The Attorney General contends that section 231.7, subdivision (d)(1) "is satisfied so long as the [trial] court allows the prosecutor to offer her reasons and then considers only those reasons given, without speculating on others." The Attorney General asserts that where, as here, the trial court notes issues concerning the prospective juror and the prosecutor then offers the same or similar concerns, "the trial

---

[12] Section 231.7, subdivision (d)(1) provides in relevant part: "The court shall consider only the reasons actually given and shall not speculate on, or assume the existence of, other possible justifications for the use of the peremptory challenge."

court should determine whether those concerns are genuinely held by the prosecutor, notwithstanding the court's statements, or are merely post hoc parroting. If genuinely held, the court must then evaluate whether those justifications are valid or run afoul of the various protections set out in the statute. (§ 231.7, subds. (d)–(g).) If not genuinely held, the concerns must be disregarded."

Similarly, the Attorney General asserts that, on appellate review, section 231.7, subdivision (j) does not preclude consideration of a reason given "because it was mentioned first by the trial court" and reading the statute in that manner would be improper under rules of statutory interpretation. Rather, an appellate court should examine the genuineness of the reason given and then evaluate the reason "through an objective lens" as prescribed by section 231.7, subdivision (d)(1).

The Attorney General argues that the prosecutor here did not simply parrot the trial court's observation that S.H. "would be thinking about the consequences" of resolving conflicts in the evidence because, instead, the prosecutor focused her reason on S.H.'s consideration of "punishment." This difference and the strength of the reason "support the conclusion that the prosecutor genuinely relied on it." Similarly, the Attorney General asserts that the trial court's use of the term evasiveness and the prosecutor's subsequent statement about S.H.'s " 'evasive questioning' " were a fair summary of the prosecutor's initial statement of reasons and do not render the prosecutor's "evasive questioning" reason "not 'actually given' " or require this court to speculate about reasons not given.

Additionally, the Attorney General contends that even if the two reasons may not be considered by this court, given the mandate of de novo review under section 231.7, subdivision (j), the trial court's denial of Ortiz's objection should be affirmed because the prosecutor's initial statement of reasons are supported by the record, neither of the two identified reasons "evinced explicit or implicit bias," and there is no substantial

likelihood that an objectively reasonable person would view S.H.'s race as a factor in the prosecutor's use of her peremptory challenge.

We agree with the Attorney General that we may consider the additional reasons given by the prosecutor. Section 231.7 makes clear that the prosecutor's actual reasons for the peremptory challenge are what matters. (See *id*., subds. (c), (d)(1), (j).) The statute directs the party exercising the peremptory challenge to state its reasons in response to an objection (*id*., subd. (c)) and precludes both the trial court and a reviewing court from speculating on other possible justifications or reasons when determining whether an objection should be or should have been sustained (*id*., subds. (d)(1), (j).)

Based on the plain meaning of the statute, a reason is "actually given" under section 231.7, subdivision (c), and thus the statute is satisfied, if the party exercising the challenge states the reason before the trial court rules on the objection, regardless that the party did not articulate the reason when initially stating its reasons upon the objection and the trial court first suggested the reason. We reject Ortiz's arguments, first, that the trial court here violated section 231.7, subdivision (d)(1) by suggesting the two additional reasons for the peremptory challenge and, second, that those reasons do not qualify as reasons actually given by the prosecutor in this case. The prohibition against speculation in section 231.7, subdivision (d)(1) precludes the trial court from conjecturing about possible justifications when ruling on whether the objection to a peremptory challenge should be sustained. However, nothing in the language of the statute confines the party who exercised the challenge to those reasons it initially stated in response to an objection. Further, the statute does not deem a reason that was in fact given by the party as not "actually given," even if the reason were first articulated by the trial court. (*Ibid*.)

Nevertheless, a reason first suggested by the trial court rather than the party exercising the challenge might call for special scrutiny by the reviewing court in its de novo review of the trial court's denial of an objection made under section 231.7. (See *People v. Booker* (2011) 51 Cal.4th 141, 166.) A colloquy such as that which occurred

30

here injects additional uncertainty into the genuineness of the party's reasons for exercising a challenge. Therefore, trial courts should consider asking a party to state at the outset all of their reasons for exercising a peremptory challenge before inviting argument on the stated reasons or proceeding to the confirmation and explanation process (§ 231.7, subd. (g)(2)).[13]

For the reasons stated above, we decide that the "evasive questioning" and consideration of punishment reasons were "actually given [by the prosecutor] under [section 231.7,] subdivision (c)" (§ 231.7, subd. (j)). Therefore, we may consider and evaluate those reasons as justifications for the peremptory challenge under section 231.7, subdivision (d)(1)—including by evaluating their genuineness and any record-based support for them—when reviewing de novo the trial court's decision overruling Ortiz's objection.

Before doing so, however, we must address whether the "evasive questioning" reason or any of the prosecutor's initially stated reasons—namely S.H.'s inability and/or unwillingness to answer questions and his "soft spoken, reluctant and timid" demeanor—are presumptively invalid under section 231.7, subdivision (g).[14]

b. Section 231.7, Subdivision (g): Demeanor/Behavior/Manner Reasons

There is no dispute on appeal that the prosecutor's reasons trigger the section 231.7, subdivision (g) inquiry. As described above, section 231.7, subdivision (g)(2)

---

[13] We reject as unsupported by the statutory text the Attorney General's suggestion in supplemental briefing that the trial court must make a determination of genuineness before it addresses any issues of the validity of the reason (§ 231.7, subds. (e)–(g)) and evaluates the reason (along with any others given) "in light of the totality of the circumstances" (*id.*, subd. (d)(1)). The trial court may consider the genuineness of the proffered reasons as part of those inquiries.

[14] Ortiz made no argument at trial and makes no assertion in this court that the consideration of punishment is a presumptively invalid reason under section 231.7, subdivision (g).

calls for a two-step inquiry concerning the presumptively invalid reasons listed in subdivision (g)(1)(A)–(C): that is, the confirmation requirement and the explanation requirement.

The parties agree that the trial court engaged in the confirmation requirement and confirmed the prosecutor's observations. Nevertheless, Ortiz contends the prosecutor's characterizations of S.H. as " 'easily confused or unable to answer questions' " and " 'soft spoken, reluctant and timid [] demeanor' " "are belied by the record, as the record shows that [S.H.] gave direct and intelligent answers to the questions." Ortiz further asserts that "the only question" asked by the prosecutor that S.H. was confused about was "whether he would be comfortable resolving conflicts in testimony" and "he directly stated that he was having trouble following the prosecutor's question. . . . He then proceeded to answer once the prosecutor clarified the question."

Regarding our standard for reviewing Ortiz's assertions, the parties apparently agree that the substantial evidence standard applies to the trial court's express finding, under section 231.7, subdivision (g)(2), confirming that the behaviors asserted by the prosecutor here occurred. We agree. We decide that the substantial evidence standard applies where—as here—the trial court has made explicit findings in the confirmation stage. (*Id*., subd. (j).)

We reject Ortiz's contention that the trial court's confirmation finding lacks substantial evidence. The record includes exchanges demonstrating S.H.'s inability to answer or understand questions, failure to answer questions, confusion, reluctance, timidity, and evasiveness. For example, S.H. responded "I don't understand the question" when the trial court asked him if he had "anything to share regarding" his "general attitude towards the criminal justice system and law enforcement." During voir dire by defense counsel, counsel asked if there was anything S.H. wanted to share and S.H. responded, "Um --"

32

When the prosecutor asked S.H. if there was any reason for his failure to complete page two of the questionnaire, S.H. answered, "What was it?"  S.H. gave this answer even though the trial court had earlier described and asked some of the questions appearing on page two.  Further, when asked about "making a decision about a conflict in testimony," S.H. said that he would not have "any problem" with that.  However, in response to a follow-up question about whether he knew what the prosecutor was "saying by that," S.H. admitted that he was "not following" the prosecutor's questions and ultimately said he would not feel comfortable resolving conflicts in testimony.

In addition, regarding S.H.'s nonverbal behaviors and demeanor that might not be reflected completely in a written transcript—such as S.H.'s soft-spoken nature, reluctance, and timidity—there is nothing in the record that calls into question the trial court's finding confirming that S.H. acted in such manner.  (See *People v. Reynoso* (2003) 31 Cal.4th 903, 926.)

S.H.'s failure to answer the questions on page two of his questionnaire further demonstrates that he was confused when completing the questionnaire.  We acknowledge that there is no substantial evidence to support a conclusion that S.H. deliberately bypassed the nine questions on the second page of the questionnaire.  We also acknowledge that other prospective jurors appear to have skipped a page when filling out the questionnaire and one prospective juror (S.D.) claimed he had in fact filled out the entire questionnaire.[15]

Although S.H. might not have intentionally skipped a page of his questionnaire, each page had a statement at the bottom reading "please fill out all pages of this form" (boldface and capitalization omitted).  In addition, the trial court repeatedly noted to the

_____

[15] S.D. was ultimately excused for cause, but there is no record of which party challenged S.D. for cause or the precise reason for his excusal.  The other prospective juror (J.C.) who had a blank page in his questionnaire and was questioned orally did not serve on the jury because he was peremptorily challenged by defense counsel at the first opportunity.

33

prospective jurors that the questionnaire had four pages and all pages had to be completed. Thus, the prosecutor had sufficient reason to argue that S.H.'s failure to complete page two of his questionnaire "shows his confusion."

Regarding evasiveness, in his questionnaire S.H. noted that he had no current occupation or employer, but he failed to answer the next question that prompted him to provide information regarding his past employment if "retired or unemployed." In the same vein, when the prosecutor asked S.H. if there was "[a]nything else" he had done with his time since his retirement from carpentry 30 years earlier (and up to his current pursuit of buying storage lockers), S.H. responded vaguely, "Just try to live" and "Just trying to live." S.H. also failed to elaborate on his prior mention of working in the restaurant business.

When asked by the trial court about his general attitude toward law enforcement and whether he had any close friends or family in law enforcement, S.H. only responded that he had a friend who was a deputy in the 2000s. In addition, S.H. appeared to act evasively when he answered "No" to the court's question about him being "a little concerned about the time of . . . this trial," despite having said in his questionnaire that he did not want to be a juror on the case because of "TIME!" S.H.'s responses demonstrate an avoidance of some topics during the jury selection process.

For these reasons, we conclude that the trial court's confirmation, pursuant to section 231.7, subdivision (g)(2), of the "asserted behavior" described in the prosecutor's initial statement of reasons and the "evasive questioning" reason are supported by substantial evidence.

The second step of section 231.7, subdivision (g)(2) requires that "the counsel offering the reason shall explain why the asserted demeanor, behavior, or manner in which the prospective juror answered questions matters to the case to be tried." (*Ibid*.)

The parties do not explicitly suggest a standard for examining a given explanation, and they do not address the standard of review applicable to our determination whether

34

the explanation requirement of section 231.7, subdivision (g)(2) has been fulfilled. Rather, the parties dispute the merits of the prosecutor's explanation in this case. The Attorney General argues that "the prosecutor stated the relevance for the presumptively invalid justifications." Ortiz replies that the prosecutor "failed to satisfactorily provide[] an explanation under section 231.7, subdivision (g)(2) of the relevance of the presumptively invalid justifications."

The trial court here did not expressly state any factual finding or ruling on the explanation provided by the prosecutor. Rather, when stating its ultimate ruling on Ortiz's objection, the court only confirmed that the asserted behaviors falling within the "presumptively invalid reasons" of section 231.7, subdivision (g)(1) had occurred.

The trial court did not refer to the prosecutor's explanation itself. Given that subdivision (j) of section 231.7 provides that only "the trial court's express factual findings [are] reviewed for substantial evidence" and "[t]he appellate court shall not impute to the trial court any findings . . . that the trial court did not expressly state on the record," we will on this record review de novo whether the prosecutor here fulfilled the explanation requirement. (See *Harring*, *supra*, 69 Cal.App.5th at p. 495.)

Section 231.7, subdivision (g)(2) requires only that the counsel who offered the presumptively invalid reason "explain why the asserted demeanor, behavior, or manner . . . matters to the case to be tried." By contrast, subdivision (e) of section 231.7 provides that "certain reasons for a peremptory challenge are presumptively invalid . . . unless rebutted by clear and convincing evidence that they are unrelated to the prospective juror's perceived membership in a protected group and that the reasons bear on the juror's ability to be fair and impartial." (*Jaime*, *supra*, 91 Cal.App.5th at p. 943, citing § 231.7, subd. (e); see also § 231.7, subd. (f) [defining the term " 'clear and convincing' " and explaining how a court determines whether "a presumption of invalidity has been overcome"].)

35

Based on the language of section 231.7, subdivision (g)(2), and given the contrasting "clear and convincing evidence" showing required to overcome the presumptive invalidity of the reasons set forth separately in section 231.7, subdivision (e), we conclude that counsel's proffer of any explanation regarding "why the asserted demeanor, behavior, or manner . . . matters to the case to be tried" fulfills the explanation requirement of section 231.7, subdivision (g)(2).

We also decide that if the confirmation and explanation requirements have been fulfilled, then the proffered reason that falls under section 231.7, subdivision (g)(1) is no longer presumptively invalid and can be considered as a valid reason when the court ultimately determines if "there is a substantial likelihood that an objectively reasonable person would view race . . . as a factor in the use of the peremptory challenge." (*Id*., subd. (d)(1).) The statute does not explicitly call for any further finding by either the trial court or a reviewing court with respect to the explanation requirement, and we see no reason in the statutory structure to imply such a requirement. In other words, in contrast to the confirmation requirement, neither the trial court nor the reviewing court must examine whether the prosecutor's explanation is supported by substantial evidence when deciding whether the explanation requirement has been fulfilled. We only determine whether any explanation was in fact provided by the prosecutor.

Nevertheless, a court may consider the substance of the prosecutor's explanation, as part of "the totality of the circumstances" inquiry. (§ 231.7, subd. (d)(1).) The trial court may do so in the first instance when ruling on the objection (*ibid*.), and a reviewing court may do so in its de novo review of the trial court's denial of an objection. (*Id*., subd. (j).)

Here, the prosecutor explained that S.H.'s inability to answer questions in an understandable fashion rendered her "unable to determine if there were potential answers to many questions that could be a reason." The prosecutor also said that S.H.'s inability to answer and "evasive questioning" left her unable "to ascertain several answers that

36

were resubmitted." Although the prosecutor did not state her explanation very articulately, we understand her to have explained that S.H.'s unclear answers, failure to answer, confusion, reluctance, and evasiveness did not allow her to determine his views and impartiality, and it was not for lack of her trying.

By providing this explanation, we decide the prosecutor fulfilled the explanation requirement of section 231.7, subdivision (g)(2).

Having concluded that the trial court's confirmation finding is supported by substantial evidence and the explanation requirement has been fulfilled, we further conclude that the reasons stated by the prosecutor in her initial statement of reasons and the evasiveness reason are valid reasons that can be considered to determine whether "there is a substantial likelihood that an objectively reasonable person would view race" (§ 231.7, subd. (d)(1)) as a factor in the prosecutor's use of a peremptory challenge against S.H. We next turn to that question.

c. Section 231.7, Subdivision (d)(1): Evaluation of the Reasons Given to Justify the Peremptory Challenge

Section 231.7, subdivision (j) states that we must review "[t]he denial of an objection made under this section . . . de novo."

Pre-section 231.7 precedent supports that "[a]n advocate may legitimately be concerned about a prospective juror who will not answer questions." (*People v. Howard* (2008) 42 Cal.4th 1000, 1019; see also *People v. Jordan* (2006) 146 Cal.App.4th 232, 256–257.) Additionally, "where a prosecutor's concern for a juror's ability to understand is supported by the record, it is a proper basis for challenge."[16] (*People v. Turner* (1994) 8 Cal.4th 137, 169, abrogated on another ground by *People v. Griffin* (2004) 33 Cal.4th 536, 555, fn. 5.)

---

[16] However, challenging a prospective juror because he or she is not "a native English speaker"—a reason not relevant here—is presumed to be an invalid reason for the use of a peremptory challenge. (§ 231.7, subd. (e)(7).)

Furthermore, Ortiz does not dispute the trial court statements that S.H. is not of the same perceived cognizable group as Ortiz or any witness, the prosecutor asked "plenty of voir dire questions" of S.H., and the prosecutor and her office had not disproportionately used preemptory challenges in the past against Black prospective jurors. (See § 231.7, subd. (d)(3).)

The two reasons that the prosecutor gave after the trial court suggested them are grounded in the record and do not evince a lack of genuineness or unlawful bias. We are mindful that when the party exercising the peremptory challenge gives additional reasons after hearing comments by the court or arguments by the objecting party, such conduct may be suggestive of unlawful bias. (See *Foster v. Chatman* (2016) 578 U.S. 488, 512 [noting the prosecutor's "shifting explanations" in concluding that the peremptory challenges were motivated in substantial part by discriminatory intent]; *Miller-El v. Dretke* (2005) 545 U.S. 231, 246 ["It would be difficult to credit the State's new explanation, which reeks of afterthought."]; *People v. Arellano* (2016) 245 Cal.App.4th 1139, 1169 [relying on *Miller-El* when examining a reason raised by a prosecutor "only after the court and defense counsel attempted to question [the prosecutor's] characterization of [the prospective juror's] employment and speculation about her political views"].)

Nevertheless, as discussed *ante* (see pt. II.A.3.b.), the prosecutor's evasiveness reason is supported by substantial evidence demonstrating S.H.'s avoidance of certain topics that hampered the prosecutor's and the trial court's ability to get answers to questions. Further, the prosecutor's genuineness in adopting the evasiveness characterization is bolstered by the similarity of that characterization to the behaviors she described in her initial statement of reasons.

Likewise, regarding the prosecutor's belatedly stated reason that S.H. would consider punishment in the face of conflicting testimony, S.H. stated in response to the prosecutor's questions that he would not "feel comfortable" resolving or "find[ing] the

facts" if witnesses were to provide competing versions of an event, because if he were "wrong it could be serious." He also apparently agreed with the prosecutor that "there could be serious consequences" flowing from his wrong decision.

We decide S.H.'s answers do show potential impairment of his ability to follow the trial court's instructions to decide "what evidence, if any, to believe" if he "determine[d] there is a conflict in the evidence" (CALCRIM No. 302) and "reach [his] verdict without any consideration of punishment" (CALCRIM No. 3550). Further, we are not persuaded by Ortiz's suggestion that the prosecutor's reason is dubious because, after the prosecutor struck S.H., "another prospective juror noted the difficulty of being comfortable resolving conflicts due to 'the gravity' of the situation" but "was accepted as an alternate." Even assuming arguendo that we can consider the voir dire of another prospective juror that occurred after the trial court had ruled on Ortiz's objection (see *Lenix*, *supra*, 44 Cal.4th at p. 624), the alternate juror's answers are not comparable to S.H.'s answers.[17]

Given that the prosecutor's two belatedly stated reasons are not implausible or unsupported by the record, we decide that they do not "fatally impair the prosecutor's credibility" or indicate unconscious bias. (*People v. Smith* (2018) 4 Cal.5th 1134, 1157–1158.)

As discussed *ante* (see pt. II.A.3.b.), the prosecutor's initial statement of reasons is supported by the record. Those reasons are legitimately related to S.H.'s ability to fulfill his duties as a juror and do not evidence conscious or unconscious bias in the prosecutor's peremptory challenge against S.H. Furthermore, the prosecutor questioned S.H. fairly and extensively, and the record does not indicate that the prosecutor or her

---

[17] When the prosecutor asked the alternate juror if he felt "comfortable resolving conflicts in testimony" or "able to roll up [his] sleeves and determine [the] facts," the alternate juror said, "*Yeah*. I mean I would have to be thorough, you know, because of the gravity and -- *but* -- *yeah*." (Italics added.)

office had disproportionately used preemptory challenges in the past against Black prospective jurors.  In addition, race was not an issue that pervaded the facts of this case.

Viewing all the prosecutor's reasons for the peremptory challenge independently and under the totality of the circumstances, we conclude that there is not a substantial likelihood that an objectively reasonable person would view race as a factor in the prosecutor's use of a peremptory challenge against S.H.  (§ 231.7, subds. (d), (j).)  We thus uphold the trial court's decision overruling Ortiz's objection under section 231.7.

Having rejected Ortiz's claim under section 231.7, we further decide that the trial court's ruling did not violate Ortiz's constitutional rights to an impartial jury, a jury venire drawn from a representative cross-section of the community, and equal protection.  Under *Batson*/*Wheeler* jurisprudence, " '[t]here "is a rebuttable presumption that a peremptory challenge is being exercised properly, and the burden is on the opposing party to demonstrate impermissible discrimination." ' [Citations.]  Under a now familiar three-step process, a defendant must first 'make out a prima facie case "by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose." [Citation.]  Second, once the defendant has made out a prima facie case, the "burden shifts to the State to explain adequately the racial exclusion" by offering permissible race-neutral justifications for the strikes.  [Citations.]  Third, "[i]f a race-neutral explanation is tendered, the trial court must then decide . . . whether the opponent of the strike has proved purposeful racial discrimination." ' [Citations.]  The defendant's ultimate burden is to demonstrate that 'it was more likely than not that the challenge was improperly motivated.' " (*People v. Armstrong* (2019) 6 Cal.5th 735, 766 (*Armstrong*).)

Because section 231.7 provides broader protection than that afforded under *Batson*/*Wheeler* (cf. *Armstrong*, *supra*, 6 Cal.5th at p. 766 with § 231.7, subd. (d)(1)–(2)), Ortiz's failure to demonstrate error under section 231.7 necessarily leads us to conclude

that there was no violation of his constitutional rights when the prosecutor exercised a peremptory challenge against S.H.[18]

B. *Evidence of Midtrial Disclosure of Molestation and Denial of Continuance*

Ortiz contends the admission of testimony by L.G., a defense character witness, about her daughter's disclosure of molestation during trial violated Evidence Code section 352 because the testimony was more prejudicial than probative and, further, rendered his trial fundamentally unfair in violation of his due process rights. Alternatively, Ortiz contends the trial court prejudicially erred in denying his requested continuance to investigate the disclosure, thereby violating his rights to the effective assistance of counsel, to prepare a defense, and to due process.

1. Background

On Thursday, March 24, 2022 (the fourth day on which witnesses were called to testify at Ortiz's trial), L.G. testified for the defense as a character witness.[19] L.G. stated that she had known and socialized with Ortiz for about 13 years, after having met him and his wife at church. L.G. had three children, including an 11-year-old daughter, and Ortiz was the godfather of L.G.'s son. L.G. testified that she never had any issues with how Ortiz treated her children. She had observed Ortiz around children, described him as "always very, very friendly with everybody," and said that she "d[id] not consider him committing anything against a child." L.G. testified that her opinion of Ortiz would not change if she knew that he was accused of touching five or even 10 girls. L.G. also testified that she believed Ortiz to be "really honest" and having "a very, very good reputation."

---

[18] Because we have addressed Ortiz's claim of error entirely on the merits, we need not consider his alternative claim regarding ineffective assistance of counsel for any argument that might have been deemed forfeited.

[19] We note that the prosecution had not yet rested its case when L.G. testified for the defense. The defense presented some of its case out of order because two prosecution witnesses were not available to testify on the day that L.G. (and the five other defense character witnesses) testified.

41

The day after L.G. testified (Friday, March 25, 2022), the prosecutor lodged a motion seeking to recall L.G. to present impeachment evidence. In the motion, the prosecutor asserted that earlier that day, L.G. had contacted the sheriff's office and reported that when she spoke with her family about her experience testifying at Ortiz's trial, her daughter disclosed that Ortiz had sexually touched her when she was six years old. The prosecutor further asserted that L.G. no longer believed that Ortiz had a "character for peacefulness" and L.G. would no longer permit Ortiz to be around her daughter. The prosecutor argued that rebuttal of good character evidence is allowed under Evidence Code section 1102, subdivision (b), and impeachment evidence, too, is permissible. The prosecutor explained that she was "not seeking to introduce the statement of [L.G.'s daughter] for its truth, but rather the basis for which the opinion of [L.G.] has changed."

In supplemental briefing on the motion to recall L.G. (filed on Monday, March 28, 2022), the prosecutor asserted further that Ortiz's presentation of L.G.'s testimony opened the door to the introduction of hearsay evidence that undermined his character evidence.

At a hearing held on Monday, March 28, 2022, the trial court indicated its inclination to permit the prosecutor to recall L.G. and said, "I think the issue is going to be the scope of her testimony if she's allowed to be recalled." Defense counsel responded that he had not had an opportunity to "really investigate these allegations or look into [them]," and the allegations appeared to be "more [Evidence Code section] 1108 type evidence. Clearly we don't have time to deal with [Evidence Code section] 1108 evidence that happens [] this late in the trial."[20]

---

[20] Evidence Code section 1108, subdivision (a), provides: "In a criminal action in which the defendant is accused of a sexual offense, evidence of the defendant's commission of another sexual offense or offenses is not made inadmissible by [s]ection 1101, if the evidence is not inadmissible pursuant to [s]ection 352." In turn, Evidence Code section 352 states: "The court in its discretion may exclude evidence if its

The prosecutor argued that because Ortiz had offered reputation and opinion evidence regarding his good character, L.G. could be cross-examined with evidence of Ortiz's conduct. The prosecutor also reiterated that she was offering the daughter's disclosure not for its truth but as a basis for L.G.'s changed opinion.

Defense counsel stated an objection "to any questions that have to do with an incident that [L.G.'s] daughter has stated [occurred] when she was six years old. We don't have time to look into it and look at the veracity." Counsel said he would be willing to stipulate that L.G. no longer considered her testimony to be valid and the trial court could instruct the jury to disregard L.G.'s testimony.

When the trial court stated that it needed to perform an analysis of the evidence under Evidence Code section 352, the prosecutor suggested that to reduce any undue prejudice, L.G.'s testimony could be limited to the fact of the daughter's disclosure of molestation. The prosecutor reiterated that the basis of L.G.'s change of opinion "is that her daughter disclosed" the molestation. Regarding the Evidence Code section 352 analysis, defense counsel added that the proposed testimony was "extremely prejudicial at this late stage" and that his strategy would have been "completely different with witnesses with how evidence came in."

The trial court ruled that the prosecutor could recall L.G. and present her testimony "in the limited fashion . . . just discussed which is to introduce it with the similar limitations to what a fresh complaint would be." The court explained further that the prosecutor was "allowed to introduce the daughter's hearsay statement just limited to the fact that there was a disclosure made and the timing of it and circumstances of it and that is for the purpose of undermining the testimony [from L.G.] that [Ortiz had] elicited." The court said it did not "really see any way to do it without making the jury

---

probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

speculate and [thought] that's probably more dangerous than getting in the actual circumstances and the disclosure."

The next day (Tuesday, March 29, 2022), the prosecutor recalled L.G. to the witness stand. Before she began testifying, Ortiz's defense counsel objected to the trial court's prior Evidence Code section 352 ruling and asserted that he would move for a mistrial if L.G. testified to her daughter's disclosure. Counsel reiterated that he had not had enough time to investigate the daughter's allegations and that the testimony was improper and should not be allowed. Alternatively, counsel asked for a continuance to "talk with her" and "investigate further." Counsel noted that on the preceding day, he had received a recorded prosecution interview of L.G. and "[had] been trying to make calls back and forth with the family after listening to that call last night. So it's just -- timing is really hard for us."

The prosecutor responded that the mistrial motion was premature and a continuance was not appropriate because she was not offering the daughter's disclosure for its truth, so investigation into the disclosure was unnecessary. The prosecutor reiterated that "[i]t is the change in [L.G.'s] opinion that is relevant for today's testimony."

The trial court reaffirmed its ruling on the propriety of the proposed testimony and denied Ortiz's continuance and mistrial requests. In addition, the court said that it would give the jury a limiting instruction for the testimony.

Under questioning by the prosecutor, L.G. testified that although she had previously told the jury about Ortiz's good character, her opinion that Ortiz was a good person had changed. L.G. stated that when she spoke with her family about her earlier testimony, her daughter "came out of the room crying and then [] said that [Ortiz] sexually assaulted her when she was six." L.G. testified that she did not know about this information previously. Ortiz's defense counsel cross-examined L.G., largely asking L.G. to recapitulate her prior statements.

44

Immediately after L.G. testified that her daughter had said Ortiz "sexually assaulted her when she was six," the trial court interrupted the testimony and gave the following limiting instruction to the jury: "[T]hat statement that was made by the person who is not in court today is not to be considered for its truth. It's only to be considered for the purpose of determining how much weight to give this witness' opinion regarding the defendant's character."

After L.G. completed her testimony, the prosecution presented one additional witness (V. Doe) and rested its case. Ortiz then testified on his own behalf, and the defense rested. The prosecution did not present any rebuttal evidence.

### 2. Legal Principles

" 'When a defense witness gives character testimony, the prosecutor may inquire of the witness whether he or she has heard of acts or conduct by the defendant inconsistent with that testimony, so long as the prosecutor has a good faith belief that such acts or conduct actually took place.' " (*People v. Hinton* (2006) 37 Cal.4th 839, 902; see *People v. Tuggles* (2009) 179 Cal.App.4th 339, 357–358; *People v. Hempstead* (1983) 148 Cal.App.3d 949, 953–954; Evid. Code, §§ 1100, 1102, subd. (b).) Nonetheless, if the impeachment or rebuttal evidence "would create a substantial danger of undue prejudice to the defendant, the trial judge has the discretion to preclude [it] under Evidence Code section 352." (*Hempstead*, at p. 954.)

Evidence Code section 352 " 'requires the exclusion of evidence only when its probative value is *substantially* outweighed by its prejudicial effect. "Evidence is substantially more prejudicial than probative [citation] [only] if, broadly stated, it poses an intolerable 'risk to the fairness of the proceedings or the reliability of the outcome.' " ' " (*People v. Jones* (2013) 57 Cal.4th 899, 948 (*Jones*); see Evid. Code, § 352.) " 'The admission of relevant evidence will not offend due process unless the evidence is so prejudicial as to render the defendant's trial fundamentally unfair.' " (*Jones*, at p. 949.)

45

"An appellate court reviews a court's rulings regarding relevancy and admissibility under Evidence Code section 352 for abuse of discretion.  [Citation.]  We will not reverse a court's ruling on such matters unless it is shown ' "the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." ' "  (*People v. Merriman* (2014) 60 Cal.4th 1, 74.)

"A midtrial continuance may be granted only for good cause.  'A showing of good cause requires a demonstration that counsel and the defendant have prepared for trial with due diligence.' "  (*People v. Winbush* (2017) 2 Cal.5th 402, 469–470; see Pen. Code, § 1050, subd. (e).)  "The granting or denial of a motion for a continuance in the midst of a trial traditionally rests within the sound discretion of the trial judge."  (*People v. Laursen* (1972) 8 Cal.3d 192, 204.)  In exercising its broad discretion, a trial court "must consider ' " 'not only the benefit which the moving party anticipates but also the likelihood that such benefit will result, the burden on other witnesses, jurors and the court and, above all, whether substantial justice will be accomplished or defeated by a granting of the motion.' " ' "  (*People v. Doolin* (2009) 45 Cal.4th 390, 450 (*Doolin*).)

"The party challenging a ruling on a continuance bears the burden of establishing an abuse of discretion, and an order denying a continuance is seldom successfully attacked.  [Citation.]  [¶]  Under this state law standard, discretion is abused only when the court exceeds the bounds of reason, all circumstances being considered.  [Citations.]  Moreover, the denial of a continuance may be so arbitrary as to deny due process.  [Citation.]  However, not every denial of a request for more time can be said to violate due process, even if the party seeking the continuance thereby fails to offer evidence.  [Citation.]  Although 'a myopic insistence upon expeditiousness in the face of a justifiable request for delay can render the right to defend with counsel an empty formality[,] . . . [t]here are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process.'  [Citation.]  Instead, '[t]he answer must be found in the circumstances present in every case, particularly in the reasons

46

presented to the trial judge at the time the request is denied.' " (*People v. Beames* (2007) 40 Cal.4th 907, 920–921; see also *Ungar v. Sarafite* (1964) 376 U.S. 575, 589.)

"A reviewing court considers the circumstances of each case and the reasons presented for the request to determine whether a trial court's denial of a continuance was so arbitrary as to deny due process.  [Citation.]  Absent a showing of an abuse of discretion and prejudice, the trial court's denial does not warrant reversal."  (*Doolin*, *supra*, 45 Cal.4th at p. 450; see also *People v. Garcia* (2022) 83 Cal.App.5th 240, 248 ["In cases where a defendant's federal constitutional rights to due process and a fair trial are implicated, courts apply the de novo standard of review."].)

### 3.  Analysis

Ortiz contends that L.G.'s testimony upon recall by the prosecutor "was more prejudicial than probative."  He argues that because the evidence of the daughter's disclosure "was ostensibly admitted only for its 'effect on the listener' – namely, [L.G.]'s change in opinion – it had negligible probative value because [L.G.] could easily have testified that she changed her opinion after learning new information and left it at that." He further asserts that a prior uncharged offense is inherently prejudicial and, in this case, "the addition of yet another accuser . . . likely caused the jury to return guilty verdicts based primarily on the number of accusations rather than based on a close analysis of the testimony from the accusers."  In addition, Ortiz characterizes the trial court's limiting instruction as "effectively useless" in the face of the "erroneously admitted prejudicial evidence" and claims that the instruction was undermined by the court's final instruction regarding the jury's consideration of uncharged sex offenses (see CALCRIM No. 1191A), because the final instruction failed to make clear that the uncharged offense involving L.G.'s daughter could not be considered.

We are not persuaded that the trial court erred under Evidence Code section 352 in admitting L.G.'s testimony.  L.G.'s testimony about her daughter's disclosure was probative of L.G.'s opinion of Ortiz's character and properly provided context for the

47

change in her opinion. If no evidence were provided about the disclosure, the jurors would have been left without any basis to evaluate L.G.'s initial opinion and her changed opinion. L.G.'s testimony also was not unfairly prejudicial in the context of the charges against Ortiz.

" 'The prejudice that [Evidence Code] section 352 " 'is designed to avoid is not the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence.' [Citations.] 'Rather, the statute uses the word in its etymological sense of "prejudging" a person or cause on the basis of extraneous factors. [Citation.]' [Citation.]" [Citation.] In other words, evidence should be excluded as unduly prejudicial when it is of such nature as to inflame the emotions of the jury, motivating them to use the information, not to logically evaluate the point upon which it is relevant, but to reward or punish one side because of the jurors' emotional reaction. In such a circumstance, the evidence is unduly prejudicial because of the substantial likelihood the jury will use it for an illegitimate purpose.' " (*Doolin*, *supra*, 45 Cal.4th at p. 439.)

The disclosure evidence here was brief and not graphic or inflammatory. (See *Doolin*, *supra*, 45 Cal.4th at pp. 438–439.) The acts described by L.G. were not more serious than those testified to by the named victims. In addition, the trial court's limiting instruction curtailed the potential for undue prejudice and foreclosed any confusion about how the jury should consider the evidence. The court further reinforced the limiting instruction with its final jury instruction that evidence admitted "for a limited purpose" could be considered "only for that purpose and for no other." We presume that the jurors followed the court's instructions. (*People v. Case* (2018) 5 Cal.5th 1, 32.)

Likewise, there was no violation of Ortiz's constitutional rights to due process. The limited admission of probative evidence regarding the disclosure was both appropriate and unexceptional, and it did not render Ortiz's trial fundamentally unfair. (See *Jones*, *supra*, 57 Cal.4th at p. 949; see also *Jammal v. Van de Kamp* (9th Cir.1991) 926 F.2d 918, 920.)

48

For these reasons, we conclude the trial court did not abuse its discretion in admitting L.G.'s testimony about her daughter's disclosure of molestation for a limited purpose; we also decide no constitutional violation occurred.

Nor did the trial court err in denying Ortiz's requested continuance for time to investigate the information that L.G.'s daughter had disclosed. Ortiz's defense counsel made his oral request for a continuance four days after the prosecutor first lodged her motion to recall L.G. with the trial court. Counsel did not provide details about the actions he had taken once he learned of the daughter's disclosure, saying only that he had listened to the prosecution's interview of L.G. and "[had] been trying to make calls back and forth with the family" on the third night after the prosecutor submitted her motion. Counsel also did not offer specifics about the investigation that he believed was necessary to adequately defend against the prosecution's proposed evidence. Counsel's minimal explanation is particularly significant because the disclosure evidence was not being admitted for its truth, only for consideration of the weight to give L.G.'s opinion regarding Ortiz's character.

Under these circumstances, because Ortiz failed to demonstrate good cause for a continuance of his trial, we perceive no abuse of discretion in the trial court's denial of Ortiz's continuance request. Furthermore, Ortiz has not persuasively demonstrated that, on this record, the trial court's refusal to grant a continuance was arbitrary or that he was deprived of his ability to present a defense or the effective assistance of counsel. We thus conclude that the trial court's denial of Ortiz's continuance request did not violate his constitutional rights.[21]

---

[21] Because we have addressed Ortiz's claim of error on the merits, we need not consider his alternative claim regarding ineffective assistance of counsel for any argument that might have been deemed forfeited.

49

## C. *CALCRIM 1193*

In the final instructions to Ortiz's jury, the trial court instructed with CALCRIM 1193 as follows: "You have heard testimony from Anthony Urquiza regarding child sexual abuse accommodation syndrome. [¶] Anthony Urquiza's testimony about child sexual abuse accommodation syndrome is not evidence that the defendant committed any of the crimes charged against him or any conduct or crimes with which he was not charged. [¶] You may consider this evidence only in deciding whether or not the alleged victims' conduct was not inconsistent with the conduct of someone who has been molested, and in evaluating the believability of their testimony." Ortiz did not object to this instruction.[22]

On appeal, Ortiz contends the trial court erred when it instructed with CALCRIM 1193 because the instruction allowed the jurors to use the CSAAS evidence to evaluate the complaining witnesses' credibility in a manner that exceeds the permissible usage, thereby lessening the prosecution's burden of proving his guilt beyond a reasonable doubt and violating his due process rights. Focusing on the last sentence of the instruction, Ortiz asserts that "[t]he instruction allows the jury to find that, because a complaining witness's conduct after the fact was consistent with having been sexually abused, the complaining witness is more believable."[23]

"We review a claim of instructional error de novo. [Citation.] The challenged instruction is considered 'in the context of the instructions as a whole and the trial record to determine whether there is a reasonable likelihood the jury applied the instruction in an impermissible manner.' " (*People v. Rivera* (2019) 7 Cal.5th 306, 326.) "We of course

---

[22] Earlier in the trial, before Dr. Urquiza testified for the prosecution, the trial court provided a similar instruction to the jury, without any defense objection.

[23] We reach the merits of Ortiz's claim despite his failure to object at trial because he contends the challenged instruction was legally incorrect and affected his substantial rights. (See *People v. Grandberry* (2019) 35 Cal.App.5th 599, 604; *People v. Gomez* (2018) 6 Cal.5th 243, 312; Pen. Code, § 1259.) In turn, we need not consider his alternative claim of ineffective assistance of counsel.

50

presume 'that jurors understand and follow the court's instructions.' " (*People v. Wilson* (2008) 44 Cal.4th 758, 803.)

Ortiz acknowledges that multiple California Courts of Appeal have upheld the language of CALCRIM 1193 as accurately informing the jury of the limited use of CSAAS evidence. (See *People v. Gonzales* (2017) 16 Cal.App.5th 494, 503–504 (*Gonzales*); *People v. Munch* (2020) 52 Cal.App.5th 464, 473–474; *People v. Lapenias* (2021) 67 Cal.App.5th 162, 175–176 (*Lapenias*).) Nonetheless, Ortiz contends that those cases were wrongly decided.

We are not persuaded by Ortiz's argument that the existing precedent is wrong. Furthermore, assessing the instruction in light of the entire record, we are not convinced that there is a reasonable likelihood the jurors here applied the instruction in an impermissible manner. The instruction told the jurors that Dr. Urquiza's testimony could not be considered as evidence that Ortiz "committed any of the crimes charged against him or any conduct or crimes with which he was not charged." Thus, the instruction explicitly precluded the use of that testimony to conclude inferentially from the victims' conduct and Dr. Urquiza's testimony that Ortiz committed the charged or uncharged crimes. Moreover, the last sentence of the instruction did not compel a conclusion that the victims' conduct was consistent with being a sexual abuse victim. In the same vein, Dr. Urquiza testified that CSAAS was not a diagnostic tool for determining whether a child had been sexually abused.

Under these circumstances, we conclude that the trial court properly instructed the jury with CALCRIM 1193, and Ortiz's constitutional rights were not violated by that instruction. (See *Gonzales*, *supra*, 16 Cal.App.5th at p. 504; *Lapenias*, *supra*, 67 Cal.App.5th at p. 175.)

D. *Cumulative Error*

Having concluded that Ortiz's claims challenging his convictions are without merit, we in turn reject his claim of cumulative prejudice resulting from the asserted

51

errors.  There is no prejudicial error to cumulate.  (See *People v. Hensley* (2014) 59 Cal.4th 788, 818.)

### III.  DISPOSITION

The judgment is affirmed.

_____
                               Danner, J.

WE CONCUR:

_____
Grover, Acting P.J.

_____
Bromberg, J.

**H050117**
***People v. Ortiz***

Trial Court:      County of Santa Cruz

Trial Judge:     Hon. Syda K. Cogliati

Counsel:         Brad Kaiserman, by appointment of the Court of Appeal under the Sixth
                 District Appellate Program, for Defendant and Appellant.

                 Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney
                 General, Jeffrey M. Laurence, Senior Assistant Attorney General,
                 Amit Kurlekar, Deputy Attorney General and Claudia H. Phillips,
                 Deputy Attorney General, for Plaintiff and Respondent.

**H050117**
*People v. Ortiz*